**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SEAN TAPP** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **NO. 07-3725** |
| **v.** | : | |
| | : | |
| **ANDY PROTO, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

May _12__, 2010                                                      Anita B. Brody, J.

## MEMORANDUM

### I. INTRODUCTION

In this § 1983 action, Sean Tapp, a Pennsylvania state prisoner currently incarcerated at

the State Correctional Institution at Huntingdon, seeks compensatory and punitive damages for

alleged violations of his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights while he

was a pretrial detainee and a convicted prisoner at Lancaster County Prison ("Prison"), a period

lasting from December 2, 2006 to October 4, 2007.[1] Tapp also alleges that defendants violated

the Racketeer Influenced and Corrupt Organizations ("RICO") Act in violation of his civil rights.

Tapp's allegations can be organized into the following categories:

(1) Religious discrimination: Tapp, a self-proclaimed black Sephardic Jew,
alleges that Prison officials interfered with his rights to religious expression by

---

[1] Tapp also sought a Temporary Restraining Order and a Preliminary Injunction, but I
denied both forms of relief in a previous order. (*See* Doc. #17.) Because Tapp may not recover
monetary damages against Defendants in their official capacities, such claims will be dismissed.
*See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997) (noting that state
officials are subject to § 1983 liability for damages only in their personal capacities, not their
official capacities). This opinion will only address Tapp's claims for monetary relief against
Defendants in their personal capacities.

denying him Kosher food during December 2006 and generally being inconsistent in serving him quality Kosher meals throughout the remainder of his time at the Prison;[2]

(2) Denial of access to courts: Tapp alleges that Defendant Romanowski denied him access to the Prison's law library and notary services; that Defendants Deputy Warden Robert Siemasko (improperly identified as "Robert Samasko") and Major Klinovski (improperly identified as "Mr. Klowonsky") failed to respond to his grievances; and that Defendants Correctional Officers ("C.O.s") Brown, McCormick, Ovens, Minotti, and Deford failed to report when his meals were not in compliance;

(3) Nonmedical and medical conditions of confinement:

(a) Tapp alleges that he was deprived of a mattress, bed space (i.e., that he was placed in an overcrowded cell), clean clothes, a place to eat, an adequately nutritious diet, clean water, shower and outdoor recreation opportunities, and disease-free cell-mates,[3] and

---

[2] Tapp's religious expression claims are aimed primarily at Defendant Andy Proto, the Food Services Director at Lancaster County Prison during the relevant period, as well as his kitchen staff, Defendants Gilberto Crespo, Nicole Goldbach, Brenda Williams, Jose Alvarez (improperly identified as "Joel Alvarez"), and Inez Cedeno (improperly identified as "Inez Calene"). Proto and his staff were employees of Aramark Correctional Services, Inc. ("Aramark"), which contracted with Lancaster County Prison to provide food services to the Prison's inmates during the relevant time period.

Tapp also alleges that the following C.O.s at the Prison aided and abetted Proto and the kitchen staff in disrupting his observance of Jewish dietary laws: Defendants C.O. Brown, C.O. McCormick, C.O. Ovens, C.O. Minotti, C.O. Zimmerman, C.O. Brendle (improperly identified as "Brendal"), C.O. Booth, C.O. Yeingst, Sergeant Trudel (improperly identified as "Trudell"), Sergeant LeFever (improperly identified as "LeFevre"), and C.O. Deford. (Compl. ¶¶ 15-28.)

Finally, Tapp alleges that Prison Chaplain Alan Huber also discriminated against Tapp on the basis of Tapp's religious beliefs. Tapp's allegations against Huber have already been dismissed. (*See* Doc. #33.)

[3] Tapp's nonmedical conditions-of-confinement claims are directed primarily against Prison Warden Vincent Guarini (improperly identified as "Mr. Guardreeni"), but also are aimed at Proto (insufficiently nutritious diet), C.O.s Brown, McCormick, Ovens, and Minotti (denial of showers and recreation), and C.O. Coco (placement of drug addict cell-mate).

(b) Tapp alleges that he was denied adequate medical care by the Prison medical staff, including Dr. Robert Doe (improperly identified as "Dr. Dough"), Nurse Rachel Downs (incompletely named "Nurse Rachel"), and Nurse Darlene Hehnly (improperly identified as "Nurse Hennly"), who allegedly failed to document and respond to his weight loss or test him for infectious diseases;

(4) Other Due Process violations: including false imprisonment by Warden Guarini; a lack of process in relation to a disciplinary hearing orchestrated by C.O. Barley, Sergeant Lesse, and an unnamed party, Shawn Rye; as well as a theft of Tapp's property allegedly perpetrated by C.O. Masterangelo and Sergeant Wolffe;

(5) Racial discrimination;[4]

(6) RICO violations: Tapp alleges that Proto and Warden Guarini profited from prison overcrowding and cheap inmate food and clothing purchases; and

(7) Conspiracies to deprive Tapp of his constitutional rights: Tapp claims that many of the above officials conspired with each other to deny Tapp his rights.

All of the defendants, except for Dr. Doe, have filed motions for summary judgment.

Tapp filed a cross-motion for summary judgment. Because many of Tapp's claims are frivolous and he has failed to provide any evidence in support of his legitimate claims, I will deny Tapp's cross-motion for summary judgment and grant Defendants' motions for summary judgment.

## II. BACKGROUND[5]

### A. Kosher Diet

Sean Tapp was born in Harlem, New York and raised in the Baptist Church. (Def. Proto et al.'s Mot. Summ. J., Ex. B, Tapp Dep. 135:15-25, Jan. 8, 2009). He has been incarcerated on

---

[4] Tapp's racial discrimination claims are asserted against Proto, Romanowski, Dr. Doe, Nurse Hehnly, Sergeant Wolffe, and C.O. Masterangelo.

[5] On a motion for summary judgment, the facts are interpreted in the light most favorable to the non-moving party. All facts are taken from Tapp's Complaint, Tapp's deposition transcript from Jan. 8, 2009, Defendants' unchallenged affidavits, and exhibits detailing Tapp's medical, legal, and dietary records.

many occasions since the early 1990s. (*Id*. at 19:23-22:1) In 2004, while serving five years in New York's Southport Correctional Facility, Tapp became a Sephardic Jew. (*Id*. at 30:24-31:15.) Although Tapp never went through a formal conversion process, he learned the customs and practices of Sephardic Jews from other inmates he met and, while he was incarcerated at New York's Great Meadow Correctional Facility, he was given informational materials about his religion from the prison's rabbi, Rabbi Kelleman. (*Id*. at 35:25-37:25). Tapp believes that he may only eat food that is blessed (i.e., meat that is slaughtered in a certain way, but no pork), and that at certain times he is to only eat unleavened bread. (*Id*. at 38:13-39:23.)

On December 9, 2006, seven days after Tapp first arrived at Lancaster County Prison, he filed a grievance request for a Kosher diet and was told to forward his request to the Chaplain's office. (*Id*. at Ex. "Tapp 2.") It is unclear at what point Tapp began receiving Kosher meals; however, on December 31, 2006, Tapp filed a second grievance regarding his meals in which he admitted that he had begun to receive hot Kosher meals approximately ten to fourteen days prior to December 31. (*See* Proto et al.'s Mot. Summ. J., Ex. F.)

Early in Tapp's stay at the Prison, Andy Proto, the Prison's Food Administrator, personally visited Tapp to discuss his Kosher diet needs. Proto told Tapp that he had "never seen or heard of a black Jew before." (Compl. ¶ 2.) Tapp recalls having several conversations with Proto about his diet. Initially, Proto told Tapp that he would provide him with cheese dishes, which Tapp did not enjoy; later, Proto began giving Tapp boiled eggs for breakfast as well as grits and oatmeal. Tapp found that Proto was willing to accommodate him, so he asked Proto for more variety in his diet. Proto agreed to try to supply Tapp with a more varied diet and Tapp was relatively satisfied with his efforts. (Tapp Dep. 124:3-125:14.)

On December 27, 2006, Proto, having received additional grievances from Tapp, contacted the rabbi at Great Meadow Correctional Facility, Rabbi Kelleman, and requested that the rabbi review the Kosher menu that Proto had developed for Tapp. Proto also contacted Rabbi Sackett, a Lancaster County rabbi, to obtain his approval of Tapp's diet. (*See* Proto et al.'s Mot. Summ. J., Ex. D.)

On January 1, 2007, prison officials began supplying Tapp with a one-page menu of Kosher meals. Officials would place a check mark beside the description of the meal that was being served (i.e., breakfast, lunch, or dinner), and both the Kitchen Supervisor in charge and a C.O. would sign the sheet. Tapp would frequently sign the sheet as well. The Kosher meals listed on the menu included: spaghetti and meatballs, lemon fish, meat loaf, brisket meat, turkey breast, salisbury steak, and cold cereal with boiled eggs, bread, and fruit. (*See id*. at Ex. E.)

Once Tapp began receiving Kosher meals, his concern turned to the way the food was served: he alleges that Proto and his staff served him the same dishes repeatedly, failed to heat the dishes (sometimes serving them raw or spoiled), wrapped the dishes poorly, etc., in an attempt to make the meals so unappetizing that he would not eat the food, which would prevent him from partaking in the Jewish custom of eating Kosher food.[6]

---

[6] In Tapp's Complaint, he claims that in 2007 he was served fish for dinner on Apr. 13, 14, 21, 22, 23, and 27; May 17, 23, 30, and 31; June 4, 7, 11, and 13; and Aug. 10; fish for lunch on Apr. 25, 27, 28, and 30; May 1, 2, 14, 17, 18, 22, 24, and 25; and June 1, 11, 13 and 16; meatloaf for lunch on Apr. 24, meatloaf for dinner on Apr. 25, and meatloaf for lunch and dinner on Apr. 26; spaghetti and meatballs on May 19, 2007; and beef brisket for dinner on May 14, 2007, and lunch and dinner on May 15.

He also alleges that his breakfast was spoiled or tampered with on Apr. 29, May 2, May 21 (Tapp claims that he ate poisoned fish that made him sick), and June 20, 2007. Tapp claims that on Apr. 28, 2007, C.O. Booth, C.O. Yeingst, and Sergeant Trudel denied him food because he refused to eat the open, cold meal he was given. Also, on May 17, 2007, C.O. Brendle and

**B. Denial of Access to Courts**

Tapp alleges that Defendant Romanowski denied him access to the law library and notary services. While Tapp was a detainee at Lancaster County Prison, he had three or four pending civil rights suits in federal district courts in New York, as well as a habeas corpus petition. (Tapp Dep. 4:22-10:15.) In addition, Tapp was representing himself in the criminal action for which he was detained at the prison. (*Id.* at 51:5-7.) Tapp visited the Prison library often–by his estimate, more than 55 times in eleven months. (*Id.* at 50:1-4).

Tapp's primary reason for going to the library was to prepare for his criminal matter. (*Id.* at 51:11-14.) Tapp contends that he never had difficulty obtaining access to the law library until the weeks leading up to his criminal trial in June or July 2007. Although he can recall neither who denied him access to the library, nor the exact dates on which the denials occurred, Tapp believes he was denied access between two and possibly five times in the weeks prior to his trial. (*Id.* at 63:25-65:7.)

Tapp also contends that Romanowski denied him notary services from April 25, 2007 to the end of his confinement at the Prison. The Prison's notarial registry demonstrates that Romanowski notarized documents for Tapp on ten occasions during Tapp's incarceration at the Prison, including four times after April 25, 2007.[7] The dockets for Tapp's civil cases that were

---

Sergeant Wolffe failed to provide him with an alternative Kosher meal when he asked for one.

Finally, Tapp claims that he was given watered-down grape juice on April 27, 2007, unwrapped grape juice on May 18, 2007, and prune juice instead of grape juice on May 5, 2007. (*See* Compl. ¶¶ 2-7, 19-24.)

[7] Tapp's signature is on the notarial registry for the following dates: Jan. 19, 2007, Feb. 6, 2007, Feb. 20, 2007, Mar. 13, 2007, Mar. 27, 2007, Apr. 24, 2007, July 17, 2007, Aug. 9, 2007, Sept. 25, 2007, and Oct. 2, 2007. (*See* Tapp Dep., Ex. "Tapp 1.")

pending while he was detained at the Prison show that Tapp was able to file materials between April 25, 2007 and October 4, 2007. (*See* Def. Romanowski et al.'s Mot. Summ. J., Ex. D, 1:06-cv-13631-KMW, filing of May 10, 2007, Doc. #7; 9:05-cv-01479-NAM-DEP, filing of May 10, 2007, Doc. #36; 9:05-cv-01442-LEK-DRH, filing of May 11, 2007, Doc. #31). As for the criminal case for which Tapp was detained at the Prison and in which Tapp was proceeding pro se, Tapp testified that he could not recall any instances in which his filings in that case were rejected for a lack of notarization. (*See* Tapp Dep. 57:22-25.)

Tapp also alleges that Deputy Warden Siemasko and Major Klinovski failed to answer his grievance complaints,[8] but he does not recall what the grievances were about, nor does he have any copies of the grievances. (*See* Tapp Dep. 77:7-78:9.) Finally, Tapp alleges that C.O.s Brown, McCormick, Ovens, Minotti, and Deford failed to report when his meals were not in compliance, on May 14 (Minotti), May 18 (McCormick), June 11 and 12 (Ovens), June 20 (Brown), and August 23, 2007 (Deford). (*See* Compl. ¶¶ 15-18, 28; Tapp Dep. 88:16-93:13.)

## C. Nonmedical Conditions of Confinement

Tapp also alleges that while he was at the Prison he failed to receive a mattress, bed space, clean underclothes, a place to eat, clean water, ventilation, and generally a clean, healthy, safe environment. He alleges that he was forced to eat every meal inside his cell in close proximity to an uncovered toilet bowl, was denied showers, and was denied recreation on Wednesdays and Sundays by C.O.s Brown, McCormick, Ovens, and Minotti. (Compl. ¶¶ 10, 15-18.) Tapp also claims that he was detained with three people in a two-person cell with inmates

---

[8] Tapp alleges that Siemasko and Klinovski failed to respond to his grievances of Dec. 2, 2006, Apr. 12, 24, 25, 26, and 28, 2007, May 23, 2007, and June 4, 2007. (Compl. ¶¶ 11-12.)

that had never been screened for diseases such as hepatitis and tuberculosis. Specifically, Tapp alleges that on May 10, 2007, C.O. Coco placed another inmate, a "dope fiend" suffering through withdrawal, into his cell. Tapp alleges that the "dope fiend" had open sores, began coughing, urinating on the floor of the cell, walking around naked, and touching Tapp's legal and personal property. (*Id*. at ¶ 25.)

According to Deputy Warden Siemasko's affidavit, Tapp was housed in a three-person cell that was 95 square feet. Otherwise, he was housed in a two-person cell that was 70 square feet. He was given a "boat bunk" to sleep in, which consisted of a plastic bunk elevated 10 inches off of the ground with a mattress inside it. (*See* Romanowski et al.'s Mot. Summ. J., Ex. E, ¶¶ 6-12.) Tapp testified that he was crowded into a two-man cell with two other men for less than six weeks, that he slept on a bunk bed and could not recall whether he had a mattress. *(See* Tapp Dep. 68:17-70:1.) Tapp states that he was given used, dirty underclothes to wear. (*Id*. at 144:18-24.) Tapp testified that C.O.s told him that the drinking water was recycled from a tank that mixed drinking and sewage water, and that he saw other inmates develop skin conditions after showering in the water. (*Id*. at 72:6-20.) According to Deputy Warden Siemasko's affidavit, the water supplied to the Prison comes from the public water supply from the City of Lancaster and is tested yearly. (*See* Romanowski et al.'s Mot. Summ. J., Ex. E, ¶¶ 13-14.)

The affidavit also notes that all inmates, even those on disciplinary status, received recreation in the form of at least "five (5) block outs per week," during which time inmates are permitted but are not required to shower or exercise. (*Id*. at ¶¶ 15-17; *see also* Tapp Dep. 76:5-21 (explaining that he received "block out" for at least an hour and a half every day, alternating between the afternoon and the evening).) With regard to the Prison's ventilation issues, prisoners

lacked control over whether the windows were open or closed. (*See* Romanowski et al.'s Mot. Summ. J., Ex. E, ¶ 19.) Tapp states that in the summertime, Prison officials failed to open the windows and as a result inmates fainted from the heat. Tapp himself never fainted, but he suffered from asthma complications. (Tapp Dep. 144:3-14.)

Tapp also complains about an incident on May 10, 2007, in which C.O. Coco placed a "dope fiend" in his cell. According to Tapp, his new cellmate was so disruptive that Tapp, who was set to begin his criminal trial on May 11, 2007, packed his things and determined to separate from the new inmate. Early in the morning, during "chow time," Tapp exited his cell with his property. When he was ordered back into his cell, Tapp refused and told the C.O.s that he would rather be sent to solitary confinement than return to the cell. Tapp was then sent to solitary confinement and was cited for interfering with food distribution and refusing a direct order to return to his cell. (*See* Tapp Dep: 97:1-98:22; Romanowski et al.'s Mot. Summ. J., Ex. G.)

Finally, Tapp claims that Warden Guarini and Proto denied him a nutritiously adequate diet. Tapp alleges that Proto failed to provide him with a peanut-butter snack bag when he was having trouble maintaining his weight and that Warden Guarini intentionally purchased cheap, low-quality food that had little nutritional value. (Compl. ¶¶ 2, 10). Tapp also alleges that on April 28, 2007, C.O. Booth, C.O. Yeingst and Sergeant Trudel refused to allow him to eat only the fruit and bread portions of his meal, and that on May 17, 2007, C.O. Brendle and Sergeant Wolffe failed to provide him with an adequate Kosher meal. (Compl. ¶¶ 20-23).

### D. Denial of Medical Care

Tapp alleges that the medical staff at the Prison failed to monitor and help him maintain his weight and failed to run basic diagnostic testing on him. Specifically, he alleges that Nurse

Darlene Hehnly failed to document his medical problems, including his weight, his blood pressure, and whether he had tuberculosis or hepatitis upon his commitment to the Prison; that Nurse Rachel Downs either failed to weigh him or failed to document his weight of 172 lbs. on May 16, 2007; and that Dr. Doe refused to order him Ensures, a nutritional supplement, and a peanut butter bag to help him gain weight. Tapp alleges that he lost weight because he was not fed an adequate Kosher diet and because Prison officials refused to give him lactose-free meals even after he complained of suffering from lactose intolerance. (Compl. ¶¶ 2, 27, 29-30.)

Tapp's medical records show that Nurse Hehnly failed to take Tapp's weight upon his commitment and merely listed the weight that Tapp recited. However, due to the confusion regarding his diet in December, the Chaplain's office requested that Tapp be weighed. On December 28, 2006, Tapp's weight was measured at 200 lbs. In January 2007, Tapp's weight was measured four times–his final weight on January 24, 2007 was 193.2 lbs. On January 26, 2007, Tapp filed a grievance stating that he was lactose intolerant and needed a modified diet. On January 29, 2007, the medical staff responded by asking him for proof of his lactose intolerance. On January 31, 2007, Tapp filed a second grievance in which he argued that he could not prove his disability because he had never previously seen a doctor for the condition. On February 2, 2007, Tapp complained to the medical staff that he was lactose intolerant and the matter was referred to Tammy Moyer, the Prison's Medical Coordinator. Moyer had Dr. Doe review Tapp's file and wrote in an email that the doctor felt that Tapp's lactose intolerance was subjective. However, Tapp was eventually placed on a lactose-free diet. (*See* Proto et al.'s Mot. Summ. J., Ex. F.)

On May 11, 2007, Tapp complained that he had lost a large amount of weight. He was

again monitored.  His weight was taken five times between May 24, 2007 and June 20, 2007, at which point Tapp's weight was 177 lbs.  On July 10, 2007, the medical staff continued Tapp on his lactose-free diet and ordered a night-time snack bag for him.  On August 7, 2007, Tapp's weight was measured at 178 lbs.  (*Id*.)

### E.  Other Due Process Violations

Tapp alleges three other due process claims unrelated to the conditions of his confinement.  First, Tapp alleges that Warden Guarini falsely imprisoned him as part of a conspiracy involving the Lancaster County Police Department and the Lancaster Court of Common Pleas.  Tapp testified that Warden Guarini agreed to accept Tapp in the Prison in the absence of a warrant for his arrest.  (Tapp Dep. 73:8-11.)  The record shows that an order committing Tapp to the Lancaster County Prison was signed by Magistrate Judge Cheryl Hartman on December 1, 2006.  (Romanowski et al.'s Mot. Summ. J., Ex. F.)

Second, Tapp alleges that Sergeant Wolffe and C.O. Masterangelo stole a photograph from his cell and never returned it to him.  Tapp testified that the photo was of his white girlfriend posing on his motorcycle.  Tapp stated that C.O. Masterangelo approached him one day during recreation time, told Tapp that he had searched his cell and found the photograph, and explained that he was confiscating the photograph because Tapp was not supposed to have something like that in his cell.  C.O. Masterangelo told Tapp he was going to give the photograph to Sergeant Wolffe to put in Tapp's property cache.  Tapp said that was fine as long as it was returned to him, but the photograph was never returned to him.  (Tapp Dep. 75:15-80:22.)

Third, Tapp alleges that his due process rights were violated by C.O. Barley during the May 12, 2007 disciplinary hearing stemming from the misconduct violation Tapp received after

the "dope fiend" was placed in his cell. The misconduct report shows that Tapp was given notice on May 10, 2007 and that the hearing was held on May 12, 2007. (*Id*. at Ex. "Tapp 4.") Tapp claims that he was not given notice of the charges against him in time to prepare a defense. (*Id*. at 101:7-19.) Tapp was not allowed to call witnesses and the hearing was not recorded. (*Id*. at 101:22-102:19.)

## F. Racial Discrimination

Tapp alleges that much of the Prison officials' behavior described above was motivated by racial animus. For example, Tapp believes that Proto denied him Kosher food because Tapp is a black man. Tapp notes that Proto told him that he had "never seen or heard of a black Jew before." (Compl. ¶ 2.) Tapp also alleges that Romanowski denied him access to the courts because of Tapp's race (Compl. ¶ 9); that Sergeant Wolffe and C.O. Masterangelo stole his photograph because Tapp is black and his girlfriend was white (Compl. ¶¶ 13-14); that Dr. Doe refused to order Ensures and a peanut butter bag for Tapp because of Tapp's race (Compl. ¶ 27); and that Nurse Hehnly mistreated Tapp upon his commitment to the Prison in a way she never treated white inmates (Compl. ¶ 30).

## G. RICO Violations

Tapp alleges that both Proto and Warden Guarini were involved in a conspiracy of graft involving the purchase and distribution of food and other materials. (Compl. ¶¶ 2, 10.) Tapp states that only he and possibly a few other inmates required Kosher food. Tapp alleges that top Prison officials such as Proto and Guarini sold the Kosher meals meant for Tapp and kept the money for themselves. (Tapp Dep. 127:12-20.) Tapp never saw any money being exchanged, but he heard officers talking about it. (*Id*. at 127:5-12.)

### H. Civil Rights Conspiracies

Tapp alleges that a number of the defendants engaged in various conspiracies to deny him his civil rights. For example, Tapp alleges that Proto and his kitchen staff conspired to deny Tapp appetizing Kosher meals (Compl. ¶¶ 2-7); that Romanowski conspired with the Lancaster County Court of Common Pleas to prevent Tapp from defending himself in his criminal case (*id.* at ¶ 9); that Warden Guarini conspired with the Lancaster County Police Department and Court of Common Pleas to falsely imprison Tapp (*id.* at ¶ 10); and that Proto and Nurse Downs conspired to keep Tapp's weight loss a secret (*id.* at ¶ 29).

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir. 1997). A fact is "material" if the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating that there are no material facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party carries this initial burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party cannot rely upon "bare assertions, conclusory allegations or

suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324. The "mere existence of a scintilla of evidence" is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

To state a valid claim under § 1983, a plaintiff must "allege the violation of a right secured by the Constitution and law of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).[9] "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (internal citations omitted).

In addition, a plaintiff must demonstrate a "close causal connection" between his injury and a defendant's conduct. *Little v. Lycoming County*, 912 F. Supp. 809, 818 (M.D. Pa. 1996). "To establish the necessary causation, a plaintiff must demonstrate a[n] . . . affirmative link between the defendant's actions and the specific deprivation of constitutional rights at issue." *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (quotation marks omitted).

Each of the moving defendants, with the exception of Nurse Downs and Nurse Hehnly,

---

[9] None of the defendants dispute that, with regard to the behavior complained of in this matter, they were acting under color of state law.

has argued that they are protected by qualified immunity.[10]  Qualified immunity shields govern-

ment officials from civil damages if their conduct did not violate "clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982).  For a plaintiff to overcome qualified immunity, "[t]he contours of the

right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Tapp has failed to provide sufficient evidence for a reasonable jury to believe that any of

the moving defendants violated his constitutional rights, nor has Tapp established anything close

to a causal connection between any Prison official's action and a specific deprivation of his

constitutional rights.  I shall address Tapp's complaints and my conclusions in turn:

(A) Religious discrimination: there is insufficient evidence that Tapp's right to

religious expression was inhibited either by the Prison's investigation into his

---

[10] Not all of the defendants are entitled to qualified immunity.  In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court denied qualified immunity to private prison guards, noting a dearth of historical precedent affording immunity to private contractors engaged in prison management activities.  *Id*. at 406-07.  The Court also determined that immunity was historically granted to provide incentives for public employees to avoid "overly timid, insufficiently vigorous" job performances, and that such incentives were not necessary where market forces could supply them (i.e., in the case of private contractors).  *Id*. at 410.

Courts have since declined to extend qualified immunity to private medical providers under contract with state prisons.  *See, e.g.*, *Jensen v. Lane County*, 222 F.3d 570, 576-79 (9th Cir. 2000) (contract psychiatrist in county facility not entitled to qualified immunity); *Hinson v. Edmond*, 192 F.3d 1342, 1346-47 (11th Cir. 1999) (no qualified immunity for private medical director of a county jail).  The Aramark employees in this case, including Defendant Proto and his kitchen staff, Defendants Crespo, Goldbach, Williams, Alvarez, and Cedeno, have no more reason than private prison guards or medical staff to receive qualified immunity, and therefore I will dispose of the claims against them on the merits.  With regard to the remaining moving defendants, because there is no reason to believe that they are private contractors, they are within the strictures of a qualified immunity analysis.

beliefs and the requirements of his religious diet, or its failure at times to provide him with a varied diet, warmed to his tastes.

(B) Denial of access to courts: Tapp has provided no evidence that Romanowski prohibited him from accessing the Prison's law library or failed to notarize his legal documents in a way that harmed Tapp. Moreover, Tapp has no constitutional right to a functional state prison grievance process, which makes his claims against Deputy Warden Siemasko, Major Klinovski, and C.O.s Brown, McCormick, Ovens, Minotti, and Deford uncognizable.

(C) Conditions of confinement violations: Tapp's allegations regarding his conditions of confinement, to the extent he has evidence supporting them, do not rise to the level of a constitutional violation and he has not demonstrated that he was harmed in any way as a result. In addition, Tapp's allegations about his medical treatment are belied by the considerable evidence in the record demonstrating that his medical needs were never neglected.

(D) Other due process violations: Tapp has provided no viable evidence that he was falsely imprisoned; he has no cognizable claim for the loss of his photograph; and he has no cognizable claim in relation to the lack of due process in his disciplinary hearing because no atypical punishment was imposed on him.

(E) Racial discrimination: again, Tapp's bare allegations do not demonstrate that he suffered racial discrimination while at the prison.

(F) RICO violations: Tapp has no evidence and no standing to bring this claim.

(G) Civil rights conspiracies: Tapp has no viable evidence to support his claim.

Consequently, the motions for summary judgment of each defendant will be granted.

## A. Religious Discrimination

Tapp's allegations regarding the Prison's treatment of his religious dietary needs can be divided into two parts: first, Tapp claims that Prison officials violated his right to religious expression by taking time to investigate his religious needs in the first two weeks of his commitment; and second, Tapp believes that Prison officials violated his right to religious expression by failing to provide enough menu variety and consistent food preparation for his liking.[11] Neither of these claims succeeds. In the first instance, the Prison had every right to take time to investigate Tapp's religious needs; in the second instance, Tapp's unwillingness to eat the same meal, cold or hot, twice on one day or several times throughout a week, fails to rise to the level of a constitutional violation.[12]

---

[11] Although many of the allegations in Tapp's Complaint make it appear that he is complaining about Prison officials' failure to provide him with Kosher meals at all throughout his detention at the Prison, his deposition testimony clarified the issue:

> I'm not saying the food was not kosher. No, the food was kosher, but I'm served these kosher meals with what's called a menu. On this menu you're suppose to–they're supposed to alternate. They're not alternating on this menu because they're giving me the same thing for lunch and dinner every day and it's cold. It's coming cold. It's not heated or nothing, so therefore, you know, I'm not going to eat this, so you're depriving me because don't nobody want to eat the same meal for lunch and dinner every day and it's cold.

Tapp Dep. 116:4-16.

[12] Tapp also alleges in his Complaint that his right to religious expression was denied when he received food that was tampered with or inappropriate. Specifically, he notes that on Apr. 27, 2007, his grape juice was watered down; on Apr. 28, 2007, his food was open; on Apr. 29, 2007, he received spoiled fruit and unwrapped bread; on May 2, 2007, his breakfast was tampered with; on May 5, 2007, he received prune juice instead of grape juice; on May 18, 2007 his grape juice was not wrapped; on May 21, 2007 he received old fish; and on June 20, 2007 his food tray was opened. (Compl. ¶¶ 4, 5, 6, 19, 22, & 24.) These "isolated examples of problems,

Under the First Amendment, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The First Amendment is applicable to the states via the Fourteenth Amendment. *DeHart v. Horn*, 227 F.3d 47, 50 (3d Cir. 2000). The Supreme Court has held that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), including those protections afforded by the First Amendment, such as its proscription against any law prohibiting the free exercise of religion. *DeHart*, 227 F.3d at 50. Pretrial detainees also enjoy at least the same constitutional protections as convicted prisoners. *Wolfish*, 441 U.S. at 545.

However, "a prisoner's right to practice his religion is not absolute," and prison officials may restrict the exercise of an inmate's religious expression "when necessary to facilitate some legitimate goals and policies of penal institutions." *Dreibelbis v. Marks*, 675 F.2d 579, 580 (3d Cir. 1982). In fact, the "mere assertion of a religious belief does not automatically trigger First Amendment protections. To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protections." *DeHart*, 227 F.3d at 51. "[I]f a prisoner's request for a particular diet is not the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request." *Id*. at 52.

Prison officials are allowed to make inquiries regarding the sincerity and religious nature of an inmate's belief when the inmate requests special treatment. *Id*. at 52 n.3. "If the request is not a constituent part of a larger pattern of religious observance on the part of the inmate . . . the

---

while regrettable, do not establish constitutional violations." *United States v. Pennsylvania*, 902 F. Supp. 565, 589 (W.D. Pa. 1995) (citing *Shaw ex rel. Strain v. Strackhouse*, 920 F.2d 1135, (3d Cir. 1990) (addressing inadequate safety allegations)).

asserted religious basis may be rejected as pretext." *Id*. Prison officials must be given some leeway in terms of time to investigate the sincerity of an inmate's religious beliefs.

Nothing in the record here shows that Lancaster County Prison officials took an undue amount of time investigating Tapp's claims. Tapp first filed a grievance regarding his Kosher needs on December 9, 2006, seven days after his commitment. Tapp began receiving Kosher food sometime between December 17-21, 2006. (*See* Proto et al.'s Mot. Summ. J., Ex. F.) Given the demands on prison administrators, who must address the needs of all the inmates under their control, it is not unreasonable that it took a little more than a week from Tapp's first grievance for him to begin receiving Kosher meals.

Moreover, despite Tapp's assertion that Proto maliciously denied him Kosher food after telling Tapp that he had never heard of a black Jew, it is clear that Proto took adequate steps to address Tapp's needs. Tapp admits that Proto personally came to Tapp's cell to discuss Tapp's problems. (Tapp Dep. 123:22-125:14). Tapp also admits that Proto was "trying to work with [him]." (*Id*. at 124:24.) On December 27, 2006, Proto even called the rabbi at Great Meadow Correctional Facility in New York, Rabbi Kelleman, with whom Tapp attended Jewish services when Tapp was incarcerated there, and discussed with the rabbi Tapp's Kosher needs. That same day, Proto emailed Rabbi Kelleman a description of the food that he had been serving Tapp to make certain that it was acceptable. (*See* Proto et al.'s Mot. Summ. J., Ex. D.) Proto then wrote to Tapp explaining to him that he had communicated with both Rabbi Kelleman and Rabbi Sackett, a rabbi in Lancaster County, and both had approved of the meals Proto was serving Tapp. Tapp admits that he and Proto "went through our little thing," but that "after a while I started receiving my kosher meals and I thanked him for that." (Tapp Dep. 125:6-9.) From this

record, it is clear that prison officials, particularly Proto, did not violate Tapp's right to religious expression by taking time to investigate Tapp's religious dietary needs prior to establishing a regular Kosher menu for him.

Tapp's allegation that he was prevented from keeping Kosher by the kitchen staff's failure, at times, to serve him a sufficiently varied diet or to serve him warm food is frivolous.[13] All that the First Amendment requires is that prison officials provide inmates "with a diet sufficient to sustain them in good health without violating the kosher laws." *Johnson v. Horn*, 150 F.3d 276, 283 (3d Cir. 1998), *overruled on other grounds by DeHart*, 227 F.3d 54. The Third Circuit has already held that a purely cold Kosher diet withstands constitutional scrutiny. *See Johnson*, 150 F.3d at 283. With regard to Tapp's concern over the lack of variety in his diet, in a nonprecedential opinion, *Kretchmar v. Beard*, 241 F. App'x 863, 865 (3d Cir. 2007), the Third Circuit found that an inmate's preference for a "wider variety of hot meals" failed to rise to the level of a constitutional concern. *Id*. Tapp admits that after 2006, the food he received was Kosher. (Tapp Dep. 116:4-5.) Moreover, there is no evidence that it lacked the nutritional content to keep him in good health if he actually ate it. *See also infra* Part IV.C.8. Therefore, Tapp's claims about the variety and warmth of his food fail.

## B. Denial of Access to Courts

Tapp alleges that Mr. Romanowski denied him notary services and access to the law

---

[13] Tapp alleges that his food was served not only cold, but raw at times. (Compl. ¶¶ 3, 4, 6, 7.) However, these are bare allegations without a scintilla of evidence to support them. At Tapp's deposition, he had ample opportunity to complain about the food, and although he complained about the food being cold, he never once described the food as raw. (*See, e.g.*, Tapp Dep. 115:17 ("Don't nobody want to eat no cold food"); 116:10-16 ("[T]hey're giving me the same thing for lunch and dinner every day and it's cold. It's coming cold. It's not heated or nothing . . . don't nobody want to eat a cold meal."))

library at the Prison, and that this impacted his ability to defend himself against criminal charges during a trial in which he proceeded pro se and impacted his ability to file motions in civil rights cases he had brought prior to his commitment to the Prison.  Tapp's failure to fulfill the pleading requirements of an access-to-courts claim is fatal to his position.

In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court determined that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id*. at 828.  An inmate cannot succeed on an access-to-courts claim, however, unless he is able to demonstrate (1) that he suffered an "actual injury" (i.e., that he lost a chance to pursue a "nonfrivolous" or "arguable" underlying claim); and (2) that he had no other "remedy that may be awarded as recompense" for the lost claim.  *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (citing *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)).  In order to proceed with an access-to-courts claim, an inmate must satisfy certain pleading requirements–that is, he must describe in his complaint what underlying claim he lost the opportunity to bring, show that such a claim is "more than mere hope," and also describe the "lost remedy."  *Id*. at 205-206 (quoting *Harbury*, 536 U.S. at 416-17).

Tapp has failed to meet the pleading requirements for an access-to-courts claim. Although he alleges that Romanowski denied him the ability to file motions by failing to notarize his legal documents and denied him access to the law library and its legal resources, it is impossible to ascertain what underlying legal claim Tapp was prevented from bringing as a result of Romanowski's alleged behavior.  Even construing Tapp's Complaint in the most liberal

manner possible, as courts are required to do for pro se litigants, Tapp has not sufficiently pled a

lost opportunity nor has he described a lost remedy. *Id.* at 206.

Tapp raises separate access-to-courts claims by alleging that Deputy Warden Siemasko

and Major Klinovski failed to respond to his grievances in violation of his Fourteenth Amend-

ment due process rights, (Compl. ¶¶ 11, 12), and that C.O.s Brown, McCormick, Ovens, Minotti,

and Deford failed to report and log when his meals were not in compliance (Compl. ¶¶ 15-18,

28).[14]   However, the Constitution does not guarantee a functioning grievance process because a

prisoner or pretrial detainee may file suit in federal court if his grievances are not answered. *See*

*Platt v. Brockenborough*, 476 F. Supp. 2d 467, 470 (E.D. Pa. 2007) (citing *Hoover v. Watson*,

886 F. Supp. 410, 418-19 (D. Del. 1995), *aff'd* 74 F.3d 1226 (3d Cir. 1995)).   Consequently,

Tapp's claims that Deputy Warden Siemasko and Major Klinovski failed to respond to his

grievances, and his claims that C.O.s Brown, McCormick, Ovens, Minotti, and Deford failed to

report and log when his meals were not in compliance, will not survive summary judgment.

### C.  Nonmedical and Medical Conditions of Confinement

Tapp also alleges that his constitutional rights were violated because he was confined in

unhealthy and unsafe conditions, and because the Prison staff was deliberately indifferent to his

serious medical needs.  Because Tapp was a pretrial detainee at the Prison until June 6, 2007, his

claims must be analyzed under two different standards.  As a pretrial detainee, his rights to be

protected from the deprivation of liberty without due process are analyzed under the Due Process

Clause of the Fourteenth Amendment, *see Hubbard v. Taylor*, 399 F.3d 150, 157-158 & n.13 (3d

---

[14] Tapp has provided no evidence that he filed grievances on the dates he lists in his
Complaint.  The only evidence that he filed any grievances at all has been supplied by the
defendants.

Cir. 2005) [hereinafter *Hubbard I*]; as a convicted prisoner, his rights are analyzed under the Eighth Amendment's ban on cruel and unusual punishment. *See Natale v. Camden County Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003).

Under the Fourteenth Amendment, when a pretrial detainee complains about the conditions of his confinement, courts are to consider whether the conditions "amount to punishment prior to an adjudication of guilt in accordance with law." *Hubbard I*, 399 F.3d at 158. To determine whether the conditions amount to punishment, a court must ask,

> [F]irst, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes. In assessing whether the conditions are rationally related to the assigned purposes, we must further inquire as to whether these conditions cause inmates to endure such genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them.

*Id.* at 159 (quoting *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 992 (3d Cir. 1983)) (internal brackets and ellipsis omitted). Courts are to consider the totality of circumstances within an institution. *Id.* at 160. In the absence of substantial evidence indicating that officials have exaggerated their interest in maintaining security and order and operating the institution in a manageable fashion, "courts should ordinarily defer to [the officials'] expert judgment in such matters." *Id.* at 159 (quoting *Wolfish*, 441 U.S. at 540 n. 23).

The Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). For a convicted prisoner to succeed with an Eighth Amendment claim against a prison official, he "must meet two require-ments: (1) 'the deprivation alleged must be, objectively, sufficiently serious;' and (2) the 'prison

official must have a sufficiently culpable state of mind.'" *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001) (quoting *Farmer*, 511 U.S. at 834). A prison official's "act or omission must result in the denial of 'the minimal civilized measure of life's necessities,'" and the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw that inference." *Farmer*, 511 U.S. at 834, 837.

Third Circuit precedent makes clear that the Fourteenth Amendment affords pretrial detainees at least as much protection as the Eighth Amendment provides convicted prisoners. *See Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000) (noting that the Eighth Amendment protections "establish a floor of sorts"); *see also Natale*, 318 F.3d at 581 n.5 (declining to decide whether the Fourteenth Amendment provides additional protections in an inadequate medical care case). The Third Circuit has also recently stated, somewhat obscurely, that "pretrial detainees are entitled to greater constitutional protection than that provided by the Eighth Amendment." *Hubbard I*, 399 F.3d at 167 n.23 (finding that the district court had erred by using the same standard to evaluate general, nonmedical conditions-of-confinement claims for both pretrial detainees and sentenced inmates).[15] Thus, although this area of the law has not been well-examined, I assume that the Fourteenth Amendment provides some measure of additional protections for pretrial detainees above what the Eighth Amendment affords convicted prisoners.

Still, after examining Tapp's specific complaints, including his concerns about cell

---

[15] Since *Hubbard I*, there has been a good deal of confusion over the significance of footnote 23. *See Detty v. MacIntyier*, No. 07-623, 2008 WL 4425096, at *2 & n.6 (E.D. Pa. Sept. 20, 2008) (noting that in separate nonprecedential opinions, the Third Circuit has analyzed a pretrial detainee's right to adequate medical care under the Eighth Amendment standard, *see Watkins v. Cape May County Corr. Ctr.*, 240 F. App'x 985 (3d Cir. 2007), and reversed a district court's decision for doing just that, *see Montgomery v. Ray*, 145 F. App'x 738, 739-40 (3d Cir. 2005)).

overcrowding, lack of proper bedding, clean clothes, clean water, ventilation, lack of access to showers and recreation, a nutritiously inadequate diet, and medically inadequate care, I conclude that Tapp has failed to show that any deprivation he suffered was sufficiently serious to rise to the level of a constitutional violation.

### 1. Cell Overcrowding

Tapp complains that he was the third man placed in a cell meant to house two men, a practice known as "triple bunking." *See Hubbard I*, 399 F.3d at 155 n.7. Tapp testified that he was triple-bunked for four to six weeks early in his incarceration at the Prison. (Tapp Dep. 69:6-70:1.)

Under a Fourteenth Amendment analysis, I must determine whether triple-bunking Tapp amounted to punishment or whether it was incident to a legitimate government purpose. *See Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) [hereinafter *Hubbard II*]. Warden Guarini contends that Tapp was triple-bunked because there was not a double cell available. (*See* Romanowski et al.'s Mot. Summ. J. 9.) Tapp has no evidence to refute this and therefore I will defer to Warden Guarini's judgment. *See Hubbard II*, 538 F.3d at 232. If a legitimate governmental purpose exists, the next step is to examine whether the condition is excessive in relation to that purpose. *Id*. at 233. Courts are to look to the totality of the circumstances, such as the size of the cell, the length of confinement, the amount of time spent in the confined area, and the opportunity for exercise, when addressing the excessiveness of the condition. *Id*. at 233 (quoting *Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir. 1996)).

In *Hubbard II*, the court examined the excessiveness of conditions in which pretrial detainees were triple-celled rather than triple-bunked, meaning that only two of the three

detainees received a bunk and the third slept on a mattress on the floor. Due to overcrowding, pretrial detainees often were triple-celled for three to seven months. *Id*. at 234. The pretrial detainees in that case alleged that the conditions led directly to injuries when those in the bunks attempted to maneuver around those on the floor at night. *See Hubbard I*, 399 F.3d at 154-155; *Hubbard II*, 538 F.3d at 239 (Sloviter, J., dissenting in part). Yet, given the totality of the circumstances, such as the detainees access to large dayrooms and the nearly $3 million dollars worth of improvements that had been made to the prison in question, the *Hubbard II* court declined to find that detainees had been subjected to "genuine privations and hardship over an extended period of time." 538 F.3d at 235.

In contrast, in this case, Tapp acknowledges that he was given a bunk bed and was in the allegedly overcrowded cell for less than six weeks. Moreover, he does not allege that he suffered any injuries other than general irritation from the triple-bunk conditions. Based on the conditions of confinement related to triple-bunking that Tapp testified about in his deposition, it cannot be concluded that he suffered through worse privations and hardships than the detainees in *Hubbard II*. Therefore, Tapp's cell spacing claim fails.

## 2. Lack of Proper Bedding

Tapp alleges that Warden Guarini failed to provide him with a mattress and bed space. However, Tapp admitted in his deposition that he was given a plastic boat bunk and that he did not recall whether he was given a mattress to place inside. (Tapp Dep. 68:15-69:5.) Moreover, Tapp testified that he was not concerned about the mattress allegation in his Complaint. (*Id*. at 69:5-6 ("I don't recall if I had a mattress or not. That wasn't even the issue.").) In light of Tapp's failure to present a cell overcrowding issue, Tapp's admission that he received a boat

bunk, and his disinterest in his mattress-related allegations, I conclude that Tapp's bedding claims against Warden Guarini cannot survive summary judgment.

### 3. Clean Clothes

Tapp alleges that he was forced to wear dirty, torn, and stained undergarments during the entirety of his commitment to the Prison. Specifically, Tapp alleges that he was given dingy socks with holes in them, stained underwear, and stained t-shirts. (Compl. ¶ 10.) Tapp testified that the clothes he had been given were used and had been worn by another man. (Tapp Dep. 144:20-24.) It is clear that under an Eighth Amendment analysis these allegations do not rise to the level of a constitutional violation. *See Young v. Berks County Prison*, 940 F. Supp. 121, 124 (E.D. Pa. 2001) (finding that an inmate who had been "forced to wear ill-fitting, dirty, or torn clothes . . . [that] no doubt caused him substantial inconvenience and discomfort," had not raised an issue of constitutional import).

The question that remains is whether the greater protections pretrial detainees are entitled to under the Fourteenth Amendment raise Tapp's clothing allegations to the level of a constitutional violation. Given the facts before me, I do not believe that they do. Tapp complains of receiving worn, stained clothes with holes in them. He does not allege that he was forced to wear unlaundered clothes during his commitment at the Prison. While Tapp might have preferred to receive brand-new clothes upon his commitment, there can be little doubt that the Fourteenth Amendment does not impose such a costly requirement on prison administrations. Consequently, Tapp's clothing claims cannot survive summary judgment.

### 4. Clean Water

Tapp alleges that the Prison's water was not connected to the city water system and was

instead recycled in a tank that mixed together sewage water and clean water. Tapp claims that blocks of salt were dropped into the water in an attempt to purify it and that Prison staff drank from bottled water rather than the Prison's water. (Compl. ¶ 10.) Tapp testified that he learned of the water recycling from C.O.s, that he saw the staff drinking bottled water, and that he saw others in the Prison with skin break-outs from the showers. (Tapp Dep. 72:17-20.)

Tapp's allegations might have been sufficient to defeat a motion to dismiss, but at the summary judgment stage, even a pro se plaintiff must still undertake the "formidable task of avoiding summary judgment by producing evidence 'such that a reasonable jury could return a verdict for [him].'" *Zilich v. Lucht*, 981 F.2d 694, 696 (3d Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Tapp's combination of bare assertions, conclusory allegations, suspicions, and hearsay do not constitute enough evidence to carry him beyond summary judgment with regard to his clean water claim.

### 5. Ventilation

Tapp also alleges that the Prison was poorly ventilated. (Compl. ¶ 10.) He testified that Prison officials kept the windows closed in the summer and that in the summertime, it could get so hot that inmates would pass out. (Tapp Dep. 144:3-9.) Because Tapp became a convicted prisoner at the beginning of the summer of 2007, only an Eighth Amendment analysis is required to dispose of this claim. I conclude that these allegations do not rise to the level of an Eighth Amendment violation. *See Georges v. Ricci*, No. 09-57 (JAP), 2010 WL 606145, at *4 (D.N.J. Feb. 18, 2010) ("[An inmate's] assertion that the cell block . . . lacked proper ventilation and was unduly hot fail[ed] to rise to the level of a Constitutional violation.").

### 6. Lack of Access to Showers and Recreation

Tapp alleges that he was denied showers and recreation every Sunday and Wednesday. (Compl. ¶¶ 10, 15, 16, 17, & 18.)  It is clear that Tapp's shower access claim is insufficient to state a constitutional violation under the Eighth Amendment.  *Platt v. Brockenborough*, 476 F. Supp. 2d 467, 471 (E.D. Pa. 2007).  I also conclude that the Fourteenth Amendment does not require prisons to allow pretrial detainees daily shower access.

The denial of access to recreation can rise to the level of a constitutional violation under the Eighth Amendment if it "poses a significant threat to an inmate's physical and mental well being.  For example, lack of exercise may constitute cruel and unusual punishment where 'movement is denied and muscles are allowed to atrophy.'"  *Id*. (quoting *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985)).  Here, Tapp was allowed to exercise at least five out of seven days a week.  Even if Prison officials prevented him from exercising on Wednesdays and Sundays, that fails to constitute a significant threat to his well being, and I conclude that it also fails to amount to punishment under the Fourteenth Amendment.

### 7. Cohabitation with a Drug Addict

Tapp alleges that on May 10, 2007, C.O. Coco removed Tapp's cellmate and replaced him with an inmate of Hispanic origin who was suffering through withdrawal symptoms. (Compl. ¶ 25.)   Tapp testified that the Hispanic inmate spent the night naked, throwing up, screaming, and attempting to grab Tapp's property.  (Tapp Dep. 98:11-16.)  While Tapp claims that this constituted cruel and unusual punishment under the Eighth Amendment, he was still a pretrial detainee at the time, and therefore his Fourteenth Amendment rights must be considered.

Under the Fourteenth Amendment, the question is whether C.O. Coco imposed a

punishment on Tapp by placing the Hispanic inmate in Tapp's cell. Tapp has not shown that C.O. Coco intended to punish him. Tapp admits that he does not know why C.O. Coco placed the inmate in Tapp's cell. (Tapp Dep. 99:5-7.) Tapp believes that the inmate was probably moved for security reasons. (Tapp Dep. 97:12-16 ("[T]hey normally house each ethnic group with their own to be less of a problem. . . . [T]he true reason [the inmate was moved] was because he was in a cell with two Caucasian males.").)

Because there is no reason to assume that the inmate was moved for anything other than security reasons, I must only determine whether the confinement condition was rationally related to the state's security interest. *Hubbard II*, 538 F.3d at 232-33. To make such a determination, a court should ask whether the condition caused an inmate "to endure such genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them." *Id*. at 233 (quoting *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 992 (3d Cir. 1983)) (internal quotation marks omitted). Tapp testified that he endured only one night with the Hispanic inmate and then refused to remain in the cell with him. (Tapp Dep. 98:6-22.) One night is not an extended period of time, so the confinement condition was not excessive. As a result, Tapp's claim fails.

### 8. Insufficiently Nutritious Diet

Tapp alleges that Warden Guarini and Proto denied all pretrial detainees, including himself, a 2,000 calorie daily diet. (Compl. ¶ 10.) Under the Eighth Amendment, prisoners are entitled to a nutritionally adequate diet. *See Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980). Because pretrial detainees are afforded at least the same constitutional protections as prisoners, the Fourteenth Amendment also guarantees pretrial detainees a nutritionally adequate diet. Tapp

has failed to provide any direct evidence that he was denied a nutritionally adequate diet. The only indirect evidence Tapp has set forth relates to his weight loss while at the Prison. However, Tapp has not shown that his weight loss was the result of an insufficiently nutritious diet as opposed to his frequent refusal to eat meals because he felt they were inadequately warm and lacked variety.

Moreover, when Tapp complained that he was not being afforded a lactose-free diet and was denied a snack bag to help him maintain his weight, prison officials complied with Tapp's demands. (*See* Proto et al.'s Mot. Summ. J., Ex. F.) Tapp's allegations do not constitute sufficient evidence to carry him beyond summary judgment.

### 9. Medical Care

Tapp alleges that he was denied adequate medical care by Nurses Down and Hehnly. (Compl. ¶ 29-30.) Specifically, Tapp alleges that upon his commitment to the Prison, Nurse Hehnly failed to document his weight or his blood pressure, failed to test him for tuberculosis and hepatitis, and was generally inattentive to his medical needs; and that Nurse Downs failed to document his weight properly on May 16, 2007. (*Id*.) The undisputed record shows that Tapp's blood pressure was checked by Nurse Hehnly upon his commitment to the Prison. (*See* Proto et al.'s Mot. Summ. J., Ex. F.) In addition, Tapp acknowledges that he has never contracted tuberculosis or hepatitis. (*See* Tapp Dep. 146:5-19.) Therefore, the only plausible claim Tapp has is that the nurses violated his right to adequate medical care by failing to properly document his weight, which dropped over the course of his first six months at the Prison by 20 pounds. (*See* Proto et al.'s Mot. Summ. J., Ex. F.) This claim fails to rise to the level of a constitutional violation and will be dismissed.

When prison officials and private contractors acting under the color of state law are deliberately indifferent to an inmate's serious medical needs, they violate the Eighth Amendment's ban against "cruel and unusual punishment." However, Tapp was a pretrial detainee during the two incidents about which he complains and thus his rights should be evaluated under the Fourteenth Amendment's due process (i.e., "punishment") standard. Defendants do not provide any explanation for why they failed to document Tapp's weight. In the absence of a legitimate state interest, a court may infer that an "arbitrary" or "purposeless" action constitutes punishment. *Hubbard II*, 538 F.3d at 232 (citing *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979)).

However, as the *Hubbard II* court acknowledged, *Wolfish* provides "scant guidance on what constitutes punishment under the Fourteenth Amendment." 538 F.3d at 236 (internal quotation marks omitted). In *Hubbard II,* the court examined Eighth Amendment cases to provide a baseline for unconstitutional conditions. A similar approach is reasonable for Tapp's claim because, even after *Hubbard I*, most Third Circuit decisions analyzing pretrial detainee claims of inadequate medical care have used the Supreme Court's Eighth Amendment rubric set forth in *Estelle v. Gamble,* 429 U.S. 97, 105-06 (1976).[16]

---

[16] *Compare King v. County of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008) (nonprecedential) (noting that in the case of the denial of medical care to a pretrial detainee, the Fourteenth Amendment inquiry "involves an indirect application of the Eighth Amendment deliberate indifference standard"); *Watkins v. Cape May County Corr. Ctr.*, 240 F. App'x 985, 986 (3d Cir. 2007) (nonprecedential) (noting that a pretrial detainee's inadequate medical care claim is analyzed under the framework established in *Estelle*); *and Young v. Speziale*, No. 07-3129, 2009 WL 3806296, at *4 (D.N.J Nov. 10, 2009) (citing *Natale*, 318 F.3d at 581, for the proposition that "[a] pretrial detainee's right to medical care under the Due Process Clause is analyzed under the same standard as a convicted prisoner's right to medical care under the Eighth Amendment"); *with Montgomery v. Ray*, 145 F. App'x 738, 739-40 (3d Cir. 2005) (nonprecedential) (reversing and remanding a district court decision on an inadequate medical care claim because the court applied the *Estelle* standard without consideration of *Hubbard I*) *and Detty v. MacIntyier*, No. 07-623, 2008 WL 4425096, at *2 & n.6 (E.D. Pa. Sept. 20, 2008)

The *Estelle* standard for a deliberate indifference claim is as follows: for conduct to rise to the level of deliberate indifference, a plaintiff must demonstrate that a defendant's acts or omissions constituted "an unnecessary and wanton infliction of pain" which is "repugnant to the conscience of mankind" and "offend[s] evolving standards of decency." *Id.* (quotation marks omitted). To satisfy this standard, a plaintiff must demonstrate both (1) that he had a serious medical need, and also (2) that the defendant was aware of this need and was deliberately indifferent to it. *See Farmer v. Brennan,* 511 U.S. 825 (1994); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979).

As to the first element, prison officials must provide care only for "serious medical needs." *Estelle,* 429 U.S. at 104. A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) (quotation marks omitted). The level of culpability required to show the second element, deliberate indifference, falls somewhere between mere negligence (carelessness) and actual malice (intent to cause harm). *Farmer*, 511 U.S. at 836-37. Negligent malpractice, standing alone, is not actionable under the Eighth Amendment. *See Estelle*, 429 U.S. at 105-06; *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1991). A prison official can be found deliberately indifferent only if the official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [also] . . . draw[s] the inference." *Farmer*, 511 U.S. at 837.

_____

(noting the tension between *Watkins* and *Montgomery*, and analyzing the inadequate medical care claim under both *Estelle* and *Hubbard I*).

While Tapp's weight loss problems could be considered a serious medical need, there is no indication that the medical staff was deliberately indifferent to his needs. Tapp's allegations against Nurse Hehnly merely concern one occasion–Tapp's initial medical intake exam when he was committed to the Prison. (Compl. ¶ 30.) Tapp's claim against Nurse Downs also relates to only one incident that occurred on May 16, 2007, when Tapp alleges that Nurse Downs failed to properly document his weight. (Compl. ¶ 29.) Yet Tapp's records show that, in general, the medical staff dealt with his weight loss in a responsible, professional manner. For example, on May 11, 2007, Tapp complained that he had lost a large amount of weight, approximately twenty pounds since January 2007. (*See* Proto et al.'s Mot. Summ. J., Ex. F.) The staff then took action: Tapp's weight was taken five times between May 24, 2007 and June 20, 2007, at which point Tapp's weight was 177 lbs. On July 10, 2007, the medical staff continued Tapp on his lactose-free diet and ordered a night-time snack bag for him. On August 7, 2007, Tapp's weight had stabilized and was measured at 178 lbs. (*Id*.)

Even if Nurse Hehnly and Nurse Downs were negligent in their duties on the two occasions Tapp complains of, those two incidents do not create a viable Eighth Amendment claim of deliberate indifference in the context of the overall amount of care Tapp received at the Prison. In addition, whatever greater protections the Fourteenth Amendment affords pretrial detainees, Nurse Hehnly and Nurse Downs's behavior did not constitute the type of "punish-ment" that substantiates a constitutional violation claim. Consequently, I will grant summary judgment for both Nurse Hehnly and Nurse Downs.

### D. Other Due Process Violations

Tapp has several other due process concerns unrelated to the conditions of his

confinement. First, he claims that he was falsely imprisoned by Warden Guarini as part of a conspiracy involving the Lancaster County Police Department and the Lancaster Court of Common Pleas. Tapp testified that Warden Guarini allowed him to be placed in the Prison when there was no warrant for his arrest. There is no evidence in the record to support Tapp's claims. The record shows that an order committing Tapp to the Lancaster County Prison was signed by Magistrate Judge Cheryl Hartman on December 1, 2006. (Romanowski et al.'s Mot. Summ. J., Ex. F.) Moreover, to the extent that Tapp's complaint is that his arrest and conviction were improper, he has failed to allege a cognizable claim under § 1983. *See Heck v. Humphrey*, 512 U.S. 477, 486 (1994) ("[T]he hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confine-ment."). Thus, Tapp's false imprisonment claim cannot survive summary judgment.

Second, Tapp claims that Sergeant Wolffe and C.O. Masterangelo stole a photograph of his girlfriend from within his cell and never returned it to him, depriving him of his property without due process of law in violation of the Fourteenth Amendment. It is unclear why the officers never returned the photo to Tapp, but regardless of whether their conduct was negligent or intentional, Tapp has no cognizable claim. To the extent that Tapp never recovered his photograph due to the officers' negligence, Tapp has no due process claim. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."). To the extent the officers acted intentionally, due process is satisfied if the state affords a meaningful post-deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[I]ntentional

deprivations [of property] do not violate [the Due Process] Clause provided . . . that adequate state post-deprivation remedies are available.").  Pennsylvania provides such a remedy.  *See Smith v. City of Philadelphia*, No. 06-3688, 2008 WL 5263916, at *2 (E.D. Pa. Dec. 16, 2008) (citing *Durham v. Dep't of Corr.*, 173 F. App'x 154, 157 (3d Cir. 2006) (nonprecedential)). Therefore, Tapp's property loss claim will also be dismissed.

Third, Tapp alleges that his due process rights were violated by C.O. Barley during a disciplinary hearing held on May 12, 2007.  (Compl. ¶ 26.)  Tapp testified that C.O. Barley failed to give him timely notice of the charges against him, failed to properly investigate the charges against him, failed to record the hearing, and prevented Tapp from calling witnesses.  (Tapp Dep. 101:7-102:19.)  In *Wolf v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court held that prisoners are entitled to some procedural protections during an administrative hearing when facing the possible deprivation of a constitutionally cognizable liberty interest.  *Id*. at 556 ("[T]here must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application [in a prison disciplinary proceed-ing].").  Such protections include adequate notice of the charges, an opportunity to call witnesses and present documentary evidence, and a statement of the grounds for disciplinary action.  *See Young v. Beard*, 227 F. App'x 138, 141 (3d Cir. 2007) (nonprecedential) (citing *Wolf*, 418 U.S. at 563-67).  However, a "deprivation" only "occurs when the prison 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Mitchell v. Horn*, 318 F.3d 523, 531 (3d Cir. 2003) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

As the *Mitchell* court noted, determining whether a prison has imposed an atypical and significant hardship on an inmate is a fact-specific inquiry.  *Id*. at 532.  Typically, courts are to

consider the duration of the complained-of confinement and the conditions of that confinement in relation to other prison conditions. *Id.* However, it is not possible to determine the duration of Tapp's confinement from the allegations in his Complaint or his deposition testimony. With regard to the conditions of his confinement, Tapp clearly preferred his confinement to sharing a cell with the inmate assigned to it. (*See* Tapp Dep. 98:18-22.) Consequently, Tapp has failed to provide evidence supporting a due process claim regarding the lack of procedural protections attached to his disciplinary hearing. *See Pabon v. Chmielewski*, No. 3:07cv1613, 2008 WL 4400795, at *3 (M.D. Pa. Sept. 23, 2008) (plaintiff failed to describe the duration or conditions of his confinement and therefore failed to state a proper due process claim).

### E. Racial Discrimination

Tapp's racial discrimination claims are frivolous. As I noted in Part II.F, Tapp alleges that Proto denied him Kosher food because of his race. Tapp claims that Proto told him that he had "never seen or heard of a black Jew before." Tapp also alleges that Romanowski denied him access to the courts because of Tapp's race; that Sergeant Wolffe and C.O. Masterangelo stole his photograph because Tapp is black and his girlfriend was white; and that Nurse Hehnly mistreated Tapp upon his commitment to the Prison in a way that she never would have treated white inmates.

All citizens, whether prisoner or pretrial detainee, are protected from invidious discrimination on the basis of race by the Equal Protection Clause of the Fourteenth Amendment. *See McDonnell*, 418 U.S. at 556. To state an equal protection claim, a plaintiff must show that the defendants' actions (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

Tapp's bare assertions that Romanowski, Wolffe, Masterangelo, and Hehnly were motivated by a racially discriminatory purpose do not constitute sufficient evidence to carry him past the summary judgment stage.

In addition, although Proto's comment can be interpreted in many ways, there is no evidence that Tapp was adversely affected by Proto's conduct. For example, Tapp has provided no evidence that other Prison inmates were able to obtain special diets without seeking approval from the Chaplain's office. Without such evidence, a reasonable jury could not find that Tapp had been racially discriminated against on the basis of Proto's off-color remark. Consequently, Tapp's racial discrimination claims will not survive summary judgment.

### F. RICO violations

Tapp alleges that Warden Guarini and Proto engaged in activities that violate the civil RICO statute, 18 U.S.C. § 1962(c). Specifically, Tapp alleges that Proto sold the Kosher meals meant for Tapp and pocketed the money for himself. (Tapp Dep. 127:12-20.) He alleges that Warden Guarini profited from his position as head of the Prison by ordering cheap supplies for food, clothing, and medical products and pocketing the excess money. Tapp never saw any money being exchanged, but he heard officers talking about it. (*Id*. at 127:5-12.)

The elements of a civil RICO claim under § 1962(c) are (1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity, (5) which results in injury to the plaintiffs' business or property. *Sedima, S.P.R.I. v. Imrex Co.*, 473 U.S. 479, 496 (1985). If a plaintiff cannot show that defendant's conduct injured his business or property, he does not have standing to bring a civil RICO claim. *Id*. at 496-97. Tapp cannot claim a business or property interest in the food, clothes, and medical products that the Prison provided him. Therefore, his

RICO claims will be dismissed.

### G. Conspiracies

Tapp alleges a number of conspiracies on the part of the defendants. These include a conspiracy among Proto and his kitchen staff to deny Tapp appetizing Kosher meals (Compl. ¶¶ 2-7); a conspiracy between Romanowski and the Lancaster County Court of Common Pleas to prevent Tapp from defending himself in his criminal case (Compl. ¶ 9); a conspiracy involving Warden Guarini and the Lancaster County Police Department and Court of Common Pleas to falsely imprison Tapp (Compl. ¶ 10); and a conspiracy between Proto and Nurse Downs to keep Tapp's weight loss a secret. (See Compl. ¶ 29.)

Tapp does not specify whether the alleged conspiracies violated § 1983 or 42 U.S.C. § 1985(3), which "prohibits conspiracies predicated on 'racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). "In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right." *Id*. at 254. To state a claim under § 1985(3), a "plaintiff must allege '(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons . . . [of] the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Id*. at 253-54 (quoting *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997)).

Tapp has provided no concrete evidence that any conspiracies to deprive him of his constitutional rights existed while he was committed to the Prison, nor, as the sections above

illustrate, can he demonstrate that he was injured as the result of some deprivation of his constitutional rights. Consequently, his conspiracy claims shall be dismissed. *See id.* at 254 ("At most [plaintiff] has supplied ambiguous allegations and vague inferences that cannot defeat summary judgment.").

## V. CONCLUSION

For the reasons enumerated above, I will grant the summary judgment motions of Andy Proto, Gilberto Crespo, Nicole Goldbach, Brenda Williams, Jose Alvarez, Inez Cedeno, Mr. Romanowski, Warden Guarini, Deputy Warden Siemasko, and Major Klinovski; as well as Sergeants Wolffe, Trudel, and LeFever; C.O.s Masterangelo, Brown, McCormick, Ovens, Minotti, Zimmerman, Brendle, Booth, Yeingst, Coco, Barley, and Deford; and Nurses Downs and Hehnly. I will deny Tapp's cross-motion for summary judgment.

s/Anita B. Brody

_____

ANITA B. BRODY, J.